**Bonnie LEVESQUE, Plaintiff,**

v.

**Jane SHEEHAN, Commissioner, Maine Department of Human Services.**

**Civ. No. 93–32–P–C.**

United States District Court,
D. Maine.

May 12, 1993.

Thomas Kelly, Pine Tree Legal Assistance, Portland, ME, for plaintiff.

Andrew Gattine, Asst. Atty. Gen., Augusta, ME, for defendant.

## MEMORANDUM AND ORDER ON MOTIONS FOR JUDGMENT ON A STIPULATED RECORD

GENE CARTER, Chief Judge.

In this action Plaintiff seeks injunctive and declaratory relief and money damages for Defendant's alleged violation of her rights under 42 U.S.C. § 1983, the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 21 of the Maine Constitution. Plaintiff, a recipient of Aid to Families with Dependent Children (AFDC) who represents a class of similarly situated individuals,[1] alleges specifically that Defendant, the Commissioner of Maine's Department of Human Services (DHS), has denied her her right to child support pass-through payments under 42 U.S.C. § 657(b)(1), as amended by the Family Support Act of 1988, Pub.L. 100–485, Title I, § 102(b). Plaintiff filed a motion for a preliminary injunction (Docket No. 6). By agreement of the parties, the proceedings on that motion were continued so that the case

might be submitted for judgment on a stipulated record. (Docket No. 11). The parties' cross-motions (Docket Nos. 16 and 19) for judgment upon a stipulated record (Docket No. 17) are now before the Court.

### I.

AFDC is a joint federal/state program providing financial assistance to families with dependent children. The federal statutory basis for the program is set forth in 42 U.S.C. § 601 *et seq.* Maine participates in the AFDC program through the Maine Department of Human Services, of which Defendant is Commissioner. 22 M.R.S.A. § 3741 *et seq.* In order to participate in the AFDC program, a state must adopt a plan which complies with federal statutory requirements. 42 U.S.C. §§ 601, 602(b). Participating states are also specifically required to adopt a federally-approved child support enforcement plan. *Id.* § 602(a)(27). A separate state entity must be established to administer the child support enforcement plan. *Id.* § 654(3). Maine has designated the Division of Support Enforcement and Recovery, a division of the DHS's Bureau of Income Maintenance, as its "IV–D agency."[2] The IV–D agency operates under a plan approved by the Office of Child Support Enforcement (the OCSE), which is the agency within the United States Department of Health and Human Services charged with administering Title IV–D.

Federal law also provides that the State's AFDC Plan must require AFDC recipients, as a condition of eligibility, to assign to the State their rights to child support from any other person. *Id.* § 602(a)(26)(A). The IV–D agency must collect child support payments and

> who have not or will not receive a $50.00 "pass-through" payment although a child support payment was mailed and postmarked by the responsible parent in the month it was due, because it was not classified as received until the following month.

---

1. By order dated February 25, 1993, (Docket No. 13), this Court certified a class consisting of all recipients of Aid to Families with Dependent Children (AFDC) in the State of Maine: a) whose rights to receive child support from an absent parent have been or will be assigned to the Maine Department of Human Services (DHS) as a condition for the receipt of AFDC benefits; and
b) who have one child or more for whom a judicial or administrative order requires periodic payment of current child support; and c)

2. Section 654 of Title 42 is found in section IV–D of the Social Security Act; thus the administrative agency mandated by that section is referred to as the IV–D agency.

of such amounts as are collected periodically which represent monthly support payments, the first $50 of payments for a month received in that month, and the first $50 of payments for each prior month received in that month which were made by the absent parent in the month when due, shall be paid to the [AFDC recipient] family without affecting its eligibility for assistance or decreasing any amount otherwise payable as assistance to such family during such month.

*Id.* § 657(b)(1).[3]

Federal regulations interpreting the statute provide that except for specifically enumerated situations:

(i) Effective June 9, 1988, the date of collection for distribution purposes' in all IV–D cases shall be the date on which the payment is received by the IV–D agency or the legal entity of any State or political subdivision actually making the collection, whichever is earliest; and

(ii) Effective January 1, 1989, a State may use on a statewide basis either the definition of the date of collection in paragraph (a)(5)(i) of this section or the date the payment is mailed, as evidenced by a legible U.S. Postal Service postmark or a legibly dated receipt from a commercial carrier, as the date of collection in all IV–D cases.

45 C.F.R. § 302.51.(a)(5)(i) and (ii). Another subsection of this regulation requires that the date of collection of child support payments made by withholding from wages or other income must be the date the wages or other income are withheld to meet the support obligation. *Id.* § 302.51(a)(4).

Plaintiff Bonnie Levesque, who receives AFDC benefits for herself and two children, is divorced from Daniel Levesque. Under the 1990 divorce decree, Daniel Levesque agreed to pay $67.00 per week as child support for their minor child. Daniel Levesque makes child support payments directly to the IV–D cashiers by mail. All payments are processed through the IV–D agency's Augusta office. For purposes of this litigation, the parties agree that on May 27, 1992, Daniel Levesque mailed a child support payment for May 1992 to the IV–D cashiers in Augusta.

In accordance with DHS policy, the IV–D cashiers identified the payment as having been received on Monday, June 1, 1992, and therefore as not having been "made" until that date. Since the IV–D agency concluded that Daniel Levesque had not made his May payment in the month when due, it did not provide Bonnie Levesque with a $50.00 pass-through payment for the month of May. DHS is unwilling to agree to change its policy to consider a payment as made on the date it is postmarked.

If, on May 27, the date he mailed his child support payment, Daniel Levesque had either delivered the payment to the Biddeford DHS office for forwarding to Augusta or if the payment had been withheld from his wages, it would have been considered by the IV–D agency to have been made in May, the month it was due. Also if Daniel Levesque lived in another state and the IV–D agency of that state advised Maine that his payment had been made in the month due, DHS would have regarded the payment as made in May even if it had not been forwarded to Maine until June.

The IV–D cashiers pick up mailed child support payments twice a day from the mailroom at DHS. The mail is delivered there by the State Postal Center, a State entity separate from that administering the support enforcement plan. The State Postal Center picks up the State's mail from the U.S. Post Office throughout the morning on all days except Sundays and legal holidays. Generally, the mail is distributed to the various State departments on the day the Postal Center

---

**3.** Under other sections of the Social Security Act, an AFDC recipient may be entitled to additional payments of state-collected child support called gap payments. *See* 42 U.S.C. §§ 602(a)(28) and 657(b)(3) and (b)(4)(B).

This Court has had the opportunity to address the so-called pass-through and gap provisions of the Social Security Act on several previous occasions. *See Wilcox v. Ives,* 676 F.Supp. 355 (D.Me.1987), *aff'd* 864 F.2d 915 (1st Cir.1988); *Schwendeman, v. Ives,* 750 F.Supp. 17 (D.Me. 1990); *Doucette v. Ives,* 744 F.Supp. 23 (D.Me. 1990), *aff'd in part and rev'd in part,* 947 F.2d 21 (1st Cir.1991); *Albiston v. Commissioner,* 1992 WL 361737 (D.Me.1992).

receives it. The State Postal Center, however, does not distribute the mail on Saturdays, Sundays, legal holidays or on weekdays when the State government is shut down. Thus, the IV–D cashiers do not receive any support payments on Saturdays, Sundays, legal holidays or government shut-down days. It is not uncommon for delays, beyond the control of the State Postal Center, to occur in the federal postal system.

The IV–D cashiers receive more than 9000 child support payments monthly, not including those forwarded by employers withholding such payments. The cashiers manually open each envelope and enter information concerning the checks into the computer. All support payments are processed on the day they are received by the cashiers, and they are credited as received on that day. Sometimes the postmarks on the envelopes containing support payments are missing or illegible. In order to implement a system whereby all support payments are credited as "made" on the date postmarked, the IV–D cashiers would have to change the processing system currently in place, perhaps requiring them to perform sorting and batching in addition to their current work. A new system might also require the agency to retain and store the envelopes as proof of the date of postmark.

On June 25, 1992, the IV–D cashiers received $268.00 by mail from Daniel Levesque. Because the IV–D cashiers had credited the payment mailed by Daniel Levesque in May to the month of June, the agency applied the June 25 payment as reimbursement for past assistance payments made to Bonnie Levesque's family. As of June 25, Daniel Levesque's child support was current and may have shown a credit. Without conceding that Daniel Levesque's account had a credit, DHS acknowledges that if an absent parent makes any advance payment of child support, the Department applies that payment to future obligations.

## II.

Plaintiff argues that under section 657(b)(1), Daniel Levesque's child support payment, which was mailed on May 27, 1992, was a payment "made by the absent parent in the month when due," entitling her to a $50 pass-through for May 1992. Defendant Commissioner argues that under the statute States need not consider a payment "made" when it is mailed. She relies on 45 C.F.R. § 302.51(a)(5)(ii), the federal regulation interpreting section 657(b)(1), which permits States to choose as the date of collection of support payments either the date of mailing or the date of the payment's receipt at the IV–D agency.

The Supreme Court has recently described the federal courts' well-established mode of reviewing challenges to an agency's interpretation of its governing statute:

> We first ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter, for the court as well as the agency must give clear effect to the unambiguous intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–843 [104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694] (1984). "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue as well as the language and design of the statute as a whole." ' ... But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute, rational and consistent with the statute, .... "

*Sullivan v. Everhart*, 494 U.S. 83, 88, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990) (some citations omitted).[4]

Section 657(b)(1) provides that the "first $50 of payments for each prior month received in that month which were made by the absent parent in the month when due, shall

---

4. *Sullivan v. Everhart* deals with federal agencies' interpretations of federal statutes. Here, Defendant is Commissioner of a state agency. She argues, however, that she is entitled to rely on the federal Secretary's interpretation of the AFDC statute. Therefore, analysis under the *Chevron* formulation, as reiterated in *Everhart*, is appropriate.

be paid to the family. . . ." It does not specifically define the term "made."

In *Kenyon v. Sullivan,* 761 F.Supp. 951 (D.R.I.1991), the court addressed the same issue raised by Plaintiff here. The Court noted that Congress, by its choice of language, had specifically distinguished the date payments are received from the date on which they are made. *Id.* at 959. The Court went on to explain:

"The Act is not framed in terms of a payment as 'received' or 'collected' in the month when due but in terms of a payment when made which suggests an irrevocable transfer of the funds into the possession or control of the agency obliged to make the pass-through." *Beasley [v. Ginsberg],* 1989 WL 202144 at 5 [ (D.Conn.1989) ], 1989 U.S.Dist. Lexis 16682 at 15. Once an absent parent posts the payment, he can do no more to complete the act of "making" a payment. . . . It would not be fair to deprive the AFDC family of a $50 pass-through when support was mailed in the month due, but, due to postal delays, the payment is not received by DHS until the following month. . . . A date of postmark rule is also in keeping with the common law rule that "payment is made when a letter containing the remittance properly addressed and with postage prepaid is deposited in the mail."

*Id.* at 959–60 (some citations omitted).

■ At the time *Kenyon* was decided, the federal agency had not issued its regulation permitting States to choose between receipt by the agency or postmark as the means of deciding if support payments were "made" when due. Defendant argues, therefore, that *Kenyon* is distinguishable from this case.[5] The court in *Kenyon* made clear, however, that in its view, it was not the absence of regulations, but the plain language of the statute which dictated the postmark rule. *Id.* at 960. The court in *Beasley,* cited in *Kenyon,* had taken the same position. *See Beasley v. Ginsberg,* 1989 WL 202144 at 5 n. 6 1989 U.S.Dist. Lexis 16682 at 16 n. 6 (D.Conn.1989).

Although not expressly finding the statutory language unambiguous, most courts have reached the same conclusion as the *Kenyon* court. *See Lawyer v. Valdez,* 763 F.Supp. 1562, 1565 (D.N.M.1990); *Berg v. Gardebring,* 708 F.Supp. 238, 240 (D.Minn.1989); *Vanscoter v. Bowen,* 706 F.Supp. 1432, 1441 (D.Wash.1988), *aff'd in part and rev'd in part sub nom. Vanscoter v. Sullivan,* 920 F.2d 1441, 1449–50 (9th Cir.1990). For example, the court in *Lawyer v. Valdez,* 763 F.Supp. at 1569, stated that the "statute contemplates that support monies shall be deemed payments made at the time they are mailed or garnished," in contrast to regulations which provide that payments are made only if they are received or collected by the IV–D agency in that month when due. The court concluded that deeming payments made only after processing through the bureaucratic scheme is "fundamentally unjust when applied to deny a support recipient a pass-through." *Id.* at 1569.

The lone voice to the contrary in this debate comes from the Ninth Circuit in *Vanscoter,* reversing the decision of the District Court to find that while a rule interpreting "made" in section 657(b)(1) to include mailing may be reasonable, the state's interpretation that a payment sent by mail is not "made" until actually received is not inconsistent with the statute. *Vanscoter v. Sullivan,* 920 F.2d at 1449–50. The court stated:

Neither the statute nor the legislative history suggests Congress considered this specific question. The federal Secretary

---

5. Defendant points to the fact that in *Kenyon* the court deferred to the Secretary's interpretation of other regulations interpreting section 657(b)(1) as evidence that it would have deferred had the current regulation already been promulgated. Judicial deference to administrative interpretations of statutes does not rise to the level of blind faith. *Wilcox v. Ives,* 676 F.Supp. at 359. There is, therefore, no reason to believe that a court will defer to any given agency interpretation just because it has previously deferred on a very different interpretation of the same statute. Moreover, in *Kenyon,* the court had before it, albeit not in regulation form, the Secretary's position that either date of receipt or date of mailing may be used by states to establish when a payment is made. *Kenyon,* 761 F.Supp. at 960 n. 8. Given the court's reasoning, it seems clear that the result would not have been different had the regulation actually been promulgated at the time of decision.

has expressed the view that plaintiffs' reading "is not the only possible construction of the Statute," and that the state's interpretation is a permissible one absent federal regulation to the contrary. We agree. . . .

*Id.* Defendant argues that this Court should adopt the *Vanscoter* reasoning and find DHS's use of the date of receipt as the date a mailed payment is "made" a permissible interpretation of the statute.

The Court agrees with the Ninth Circuit that Congress did not consider the specific question of when a payment is to be deemed "made" when it amended section 657 in 1988. That amendment made explicit what this Court and many others had held: that multiple pass-throughs were allowed if the IV–D agency received more than one support payment in a given month. *See Wilcox v. Ives,* 676 F.Supp. 355. The amendment also restricted pass-through payments to situations in which the child support payment being passed through had been made in the month when due. The Court's examination of the language and purpose of the amended statute as well as the interpretations of it by the Secretary of Health and Human Services, demonstrates that Defendant's interpretation of the statute is impermissible.

As the courts in *Kenyon* and *Beasley* noted, the language of section 657(b)(1) is not framed in terms of payments "received" or "collected" when due, but rather "made" when due. *Kenyon,* 761 F.Supp. at 960 (*quoting Beasley,* 1989 WL 202144 at 5 n. 6, 1989 U.S.Dist. Lexis 16682 at 16 n. 6). Moreover, in drafting the statute Congress clearly distinguished between when payments are made and when they are received. *Id.* at 959. Thus, although the statutory language does not state explicitly when a payment is made, it strongly indicates that it is not, or at least may not be, when it is received.

In 1987 the Court had the opportunity to examine the prior version of section 657(b)(1) and its implementing regulation in *Wilcox v.*

*Ives,* 676 F.Supp. 355. In *Wilcox,* which was later affirmed on appeal, the Court found that a primary policy goal of the AFDC statute's child support provisions was to provide an economic incentive for the absent parent's payment of child support.[6] *Id.* at 360. As the Court there stated: "It does not require much reflection to understand that an absent parent is less likely to comply with support obligations if payments are not passed through to the family." *Id.*

The same reasoning applies in the situation presented here. As noted by the court in *Beasley,* 1989 WL 202144 at 5, 1989 U.S.Dist. Lexis 16682, at 15, "[t]he practicalities dictate the use of the mail by most absent payers." Thus, if an absent parent who makes his support payments directly to DHS must mail the payment late in the month when due, he is less likely to do so if he knows that its arrival at the DHS office in the next calendar month will result in his family not receiving the benefit of the $50 pass-through. As this Court stated, and the Court of Appeals reiterated, in *Wilcox,* "[a]n interpretation of the legislation that allows a result so clearly contrary to the object of encouraging the payment of child support does not accurately represent the true intent of Congress in enacting the statute." *Wilcox v. Ives,* 676 F.Supp. at 360, *aff'd* 864 F.2d at 920.

Both this Court and the Court of Appeals also recognized in *Wilcox* that another of the basic goals of section 657(b) is to provide extra assistance to families raising dependent children to ensure that the children receive the sustenance and shelter they need. *Wilcox v. Ives,* 676 F.Supp. at 360, *aff'd* 864 F.2d at 919. A regulation or policy like the one in effect in Maine arbitrarily denies a pass-through to a recipient family for a given month because the support payment arrived at DHS a few days late, through no fault of the family or the absent parent. It thus denies the AFDC family additional welfare benefits to which it is entitled, contravening the broad policies of the AFDC scheme. *Id.*

---

6. Although Congress has amended the statute to make clear that multiple $50 pass-throughs are available only when the absent parent makes a timely support payment, there is no indication

that with the amendment Congress intended to change the original purpose of the provision. *Schwendeman v. Ives,* 750 F.Supp. at 20 n. 3.

Defendant here relies on the federal regulation to absolve it from responsibility in the current matter and urges this Court to defer to the Secretary's interpretation of the statute. Section 657(b)(1) provides for pass-through of "the first $50.00 of payments for each prior month received in that month which were made by the absent parent in the month when due." The regulatory posture of the Department of Health and Human Services with regard to section 657(b)(1) is inconsistent, distinguishing between support payments made directly by the absent parent and those withheld by the absent parent's employer. *Compare* 45 C.F.R. § 302.51(a)(5) *with* 45 C.F.R. § 302.51(a)(4).

In promulgating regulations under the section, the Secretary found that in cases in which child support payments are *withheld* by the absent parent's employer, Congress intended "to apply the $50 pass-through ... to any case in which an absent parent's support payment is irrevocably withheld from his or her wages in the month in which the payment was due." 56 Fed.Reg. 22339 (1991). The Secretary explained in rather cumbersome prose: "Use of the date of the employer's check or the date of receipt by the initial point of receipt in the State does not necessarily ensure distribution of the amount withheld as having been paid in the month it was due and withheld." *Id.*

It is plain that the Secretary understood Congress to intend that payment is "made" when the support money cannot be revoked by the absent parent. Despite the cryptic nature of the explanation, the Secretary also clearly understood that allowing the date a withheld payment is received by the State to be the operative date for permitting the pass-through presented a risk that payments "made" through withholding in the month when due would not be properly distributed. In the same rule-making, however, the Secretary allowed payments directly *mailed* to the IV–D agency to be credited as "made" either when received by the agency or when mailed despite the fact that they are covered by exactly the same language in section 657(b)(1) as the *withheld* child support payments. *Id.*

The reason provided for treating withheld child support payments differently from mailed payments for pass-through purposes is that the statutory amendments "will result in the payment of support through income withholding in a greater proportion of cases" than before. *Id.* This rationale for the distinction between the two methods of collecting child support payments makes *no* sense whatsoever. If making the payment means irrevocable commitment of the absent parent's funds in one case, it should mean that in the other. And if using the date of receipt at the IV–D agency for determining availability of a pass-through poses a risk that qualified payments may not get passed-through in the case of withholding, it logically poses the same risk when payment is effected by mail.[7] Obviously, the policies of the statute are the same whether the payment is effected by withholding or mail.

In *Wilcox* the Court of Appeals faulted the Secretary for a long history of inconsistent regulation under the prior enactment of section 657(b)(1). *Wilcox v. Ives,* 864 F.2d at 923. Initially, after the amendment of section 657, the Secretary did not alter the regulation concerning child support payments mailed directly to the agency, and took the position in pending litigation that receipt of the payment by the agency in the month due was required for a pass-through to be available. *See e.g., Vanscoter v. Bowen,* 706 F.Supp. at 1441. Subsequently, in contrast with his position regarding the pass-through of support payments withheld by the absent parent's employer, the Secretary has taken the position that either receipt by the IV–D agency or mailing can constitute the making of a payment for purposes of the pass-through. *See e.g., Kenyon,* 761 F.Supp. at 960 n. 8. This inconsistency on the part of a regulatory agency is not entitled to deference

---

7. In the rulemaking the Secretary mistakenly focuses on the date of collection, stating: "Under the new law, the AFDC family may not be denied the $50 payment when the absent parent pays support on time but there is a delay in transmitting the payment from the point of collection to the agency responsible for distribution." As the Court noted previously, the statute is not framed in terms of payments "received" or "collected" when due, but rather "made" when due. *See supra* at 785; *see also Kenyon,* 761 F.Supp. at 960.

by a reviewing Court. *Wilcox v. Ives*, 864 F.2d at 923.[8]

■ DHS's decision to consider a child support payment mailed to it directly by the absent parent as "made" for purposes of distributing it as a pass-through under section 657(b)(1) only when it is received by the IV–D agency in the month when due penalizes the recipient family for circumstances beyond its control. Although the federal regulation under which the state agency operates permits such an interpretation of the statute, the Court should not defer to the judgment of the federal agency when there are "compelling indications" that the interpretation is "wrong". *Wilcox*, 676 F.Supp. at 359 (quoting *Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86, 94–95, 94 S.Ct. 334, 339–40, 38 L.Ed.2d 287 (1973)). The statutory language and purpose, as well as the inconsistent approach to the statute taken by the Secretary, provide compelling indications here that the Secretary's position is erroneous.

Defendant urges the Court to take into account the dislocation of its processing system which will occur if it is required to determine the date of mailing of all the payments made directly by absent parents. Such dislocation is to be taken in stride, however, if the statute requires it. In explaining operation of the rule for determining when employer-withheld child support payments are made, the Secretary demonstrated that agencies may well be required to take several extra steps to comply with the statute: "If the employer fails to report the date of withholding, the IV–D agency must reconstruct that date by contacting the employer or comparing actual amounts collected with the pay schedule specified in the court or administrative order." 45 C.F.R. § 302.-51(a)(4); 56 Fed.Reg. 22339. Certainly, requiring the recording of the postmark date of payments received is not too much of a bur-

den to impose on the state agency, even when the volume of those payments is as high as is here reported. Once a system is established, it is possible that only one more data entry will be required for each item.

Defendant has also expressed concern about ascertaining the postmark date when it is not readily apparent. The Court is satisfied, however, that a fair and simple system, perhaps involving a reasonable presumption concerning mail delivery in the State, could be devised with *a modicum of bureaucratic ingenuity*. On the record presented here, the Court does not foresee, and cannot find, that the administrative burden on the agency to document the date of postmark should be any greater than that required by the Secretary in cases of withheld child support.[9]

As the Court stated in a slightly different context in *Wilcox*, no rational purpose is served by denying child support to a needy family when the child support payment was mailed by the absent parent in the month it was due but did not arrive at the IV–D agency until a later month. *See Wilcox*, 676 F.Supp. at 359.

### III.

■ Defendant argues that Plaintiffs should be precluded from bringing this suit because Title IV–D of the Social Security Act does not create enforceable rights under section 1983. This Court has previously determined that such a private right of action does exist, *Albiston v. Maine Commissioner of Human Services*, No. 92–262–P–C (D.Me. Sept. 3, 1992), *appeal pending* No. 93–1137, and will not reconsider that decision at this time.

### IV.

■ With her second cause of action, Plaintiff seeks a determination that there has been a taking of her private property without

---

8. In *Vanscoter*, the Court of Appeals for the Ninth Circuit, the only court finding a date of receipt rule permissible, specifically disagreed with the position of the First Circuit Court of Appeals on the issue of deferring to the agency's interpretation of section 657(b)(1). *Vanscoter*, 920 F.2d at 1446.

9. Defendant also raises the specter of having to store all the payment envelopes to document the agency's position in the event of future challenges. Again, the Court is satisfied that if the State has established reasonable procedures for documenting postmarks, the lack of the actual envelopes should present no problem.

just compensation in violation of her rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 21 of the Maine Constitution.[10] The property she alleges was taken is apparently the past pass-through payments not paid to her because of the policy of the IV–D agency disapproved above. In *Farley v. Maine Department of Human Services*, 621 A.2d 404 (Me.1993), as a result of this Court's decision in *Wilcox*, the Maine Law Court recently addressed the issue of whether the State's illegal denial of pass-through payments constitutes a taking without just compensation. The court found no taking because pass-through payments are a form of AFDC benefits, and "under current Maine law, AFDC recipients do not have property rights in welfare aid." *Id.* at 407.

■ The question whether a given bundle of rights is property for purposes of the protections afforded by the United States Constitution must be decided by a federal court. *Hoffman v. City of Warwick*, 909

F.2d 608, 615 (1st Cir.1990). The federal court's decision may be informed by state courts' explanations of the interests at issue, but it need not defer to their determinations of whether the interests constitute property. The need for such a rule is particularly obvious in a case like this where the interests at issue are governed in part by federal law.

■ The Fifth Amendment provides that "private property" may not "be taken for public use without just compensation." Among the property interests protected by the Fifth Amendment are contractual rights against the government. *Hoffman*, 909 F.2d at 616. Although a welfare recipient's interest in continued benefits is considered "sufficiently fundamental" to prohibit their termination without procedural due process,[11] the expectation of such public benefits does not confer a contractual right to receive the expected amounts, for Congress can always change the law governing the entitlement. *Richardson v. Belcher*, 404 U.S. 78, 80–81, 92 S.Ct. 254, 256–57, 30 L.Ed.2d 231 (1971).[12]

---

**10.** Plaintiff attempts with this claim to recover money damages retroactively for the pass-through payments not made by the State, a remedy often barred to successful Plaintiffs in this situation because of the strictures of the Eleventh Amendment. As the Law Court noted, however, "the defense of sovereign immunity will not insulate the State from liability if it is found to have committed an unconstitutional taking." *Farley v. Maine Department of Human Services*, 621 A.2d 404, 406 (Me.1993).

**11.** This Court has recently decided that, for purposes of procedural due process, welfare recipients do have a property interest in the pass-through payments authorized by 42 U.S.C. § 657(b)(1). *Albiston v. Maine Commissioner of Human Services*, 1992 WL 361737 (D.Me.1992) ("no question that pass-through payments are subject to due process requirements"). In making its decision, this Court relied on similar decisions from a number of other jurisdictions. *Bennett v. White*, 865 F.2d 1395, 1404–05 (3rd Cir. 1989); *Kenyon v. Sullivan*, 761 F.Supp. at 961 ("Section 657(b)(1) creates a property interest for plaintiffs in the pass-through payments. In accordance with the constitution, plaintiffs cannot be deprived of that property interest without due process of law."); *Lawyer v. Valdez*, 763 F.Supp. at 1569; *Beasley v. Harris*, 671 F.Supp. 911, 921 (D.Conn.1987).

Property interests requiring procedural due process protections, however, do not always require the full panoply of constitutional protec-

tions. *See Weinberger v. Salfi*, 422 U.S. 749, 771, 95 S.Ct. 2457, 2470, 45 L.Ed.2d 522 (1975); *Hoffman v. City of Warwick*, 909 F.2d at 616 n. 7. As the Supreme Court stated in *Richardson v. Belcher*, "the analogy drawn in *Goldberg* [*v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287] between social welfare and property cannot be stretched to impose a constitutional limitation on the power of Congress to make substantive changes in the law of entitlement to public benefits." *Richardson v. Belcher*, 404 U.S. at 81, 92 S.Ct. at 257.

**12.** Plaintiff cites *Ruckelshaus v. Monsanto*, 467 U.S. 986, 1012, 104 S.Ct. 2862, 2877–78, 81 L.Ed.2d 815 (1984) to refute the notion that Congress's ability to change the law should determine whether an interest is property for purposes of the Takings Clause. In *Monsanto*, however, the property at issue was Plaintiff's trade secrets, which existed as property independent of Congress's enactment. *Id.* Here, the AFDC payment known as a pass-through is defined by Congressional enactment and is always subject to reasonable, nonarbitrary change.

In determining whether a taking has occurred, courts first determine whether there is a constitutionally-protected property interest. They then make factual inquiries concerning the economic effect of the challenged governmental regulatory action, the nature of the action, and whether the regulation has interfered with distinct investment-backed expectations. *See, Hoffman*, 909 F.2d at 617. In *Monsanto*, having first determined that trade secrets constitute property for purposes of the takings clause, the Court applied

As the Supreme Court has stated, welfare recipients have "no protected property right to continued benefits at the same level." *Bowen v. Gilliard,* 483 U.S. 587, 605, 107 S.Ct. 3008, 3019, 97 L.Ed.2d 485 (1987).

■ Since welfare recipients have no protected property right in their benefits, the Court cannot find that Defendant effected a taking of Plaintiff's "property" without just compensation by failing to pay Plaintiff pass-through payments which were required by federal statute.[13] This is, of course, the same result reached by the *Farley* court. As the Supreme Court stated in *Gilliard,* "[i]t would be quite strange indeed if, by virtue of an offer to *provide* benefits to needy families through the entirely voluntary AFDC program, Congress or the states were deemed to have *taken* some of those very family members' property." *Id.*

Plaintiff argues strenuously that pass-through payments should not be considered welfare benefits because the funds for them do not come from the State treasury. In order to be eligible for AFDC, however, Plaintiff is required to make an unconditional assignment to the State of her right to child support. *Mosley v. Hairston,* 920 F.2d 409, 417 (6th Cir.1990). The funds thus received become State funds and are paid to AFDC recipients from the State treasury. *Id.; Kenyon,* 761 F.Supp. at 957. Moreover, the Court of Appeals has determined that the $50 pass-through is a welfare benefit. In *Wilcox* the court characterized the payment "as an integral element of the AFDC support system as envisioned by the DEFRA amendments. . . . 'It is additional assistance.' " *Wilcox v. Ives,* 864 F.2d at 919–20 (quoting *Beasley v. Harris,* 671 F.Supp. at 921). Since the pass-through payments at issue are welfare benefits and welfare benefits do not constitute property, the Court finds that there has been no taking of Plaintiff's property in violation of her rights under the Fifth Amendment Takings Clause.

### V.

Accordingly, it is *ORDERED* that Plaintiff's Motion for Judgment on a Stipulated Record be, and it is hereby *GRANTED* on the first cause of action.

The Court hereby *DECLARES* that the rights of Plaintiff and the Plaintiff class to pass-through payments under 42 U.S.C. § 657(b)(1) have been denied by Defendant's policy of deeming child support payments mailed directly to the IV–D agency by the absent parent as "made" only when the pay-

the standard analysis to determine whether an Environmental Protection Agency [EPA] regulation under amendments to the Federal Insecticide, Fungicide, and Rodenticide Act [FIFRA] effected a taking of Monsanto's property by allowing the EPA, as part of the registration process, to collect and disclose Plaintiff's trade secrets concerning its pesticides. Prior to 1972, FIFRA had been silent as to whether the EPA could use and disclose trade secrets submitted as part of a registration application. After 1978, the statute specifically allowed such use and disclosure. Between 1972 and 1978, however, the statute gave a company applying for registration a guarantee of confidentiality and exclusive use with respect to trade secrets. *Id.* The Court found that for the period 1972 to 1978, despite Congress's ability to change the law concerning disclosure, Monsanto had an investment-backed expectation of privacy for its property (trade secrets) based on the then current statute. If the agency administering the act undertook to disclose the information without just compensation within that period, it would be taking Plaintiff's property.

The FIFRA statute, as it existed between 1972 and 1978, provided an investment-backed expectation concerning Plaintiff's *preexisting* property

rights. The fact that the statute may change does not affect what the property holder's expectations are at a fixed point in time for determining whether a taking of the independently *existing* property has occurred. The statute does not determine the interests held, but rather how the law will protect those interests or what holders of the interests can reasonably expect with respect to them. If an administrative agency acts contrary to the expectations engendered by statute, that is an indication that the agency may have taken the property. In the case of welfare benefits, however, the statute serves to create an entitlement. The nature of the interest created, however, is transitory, for Congress can for myriad reasons alter or even eliminate the entitlement. If the administrative agency acts contrary to the expectations engendered by the entitlement statute at any given time, it may dash Plaintiff's expectations, but those expectations did not concern an interest that is considered property for purposes of the Takings Clause.

**13.** The Supreme Court explained in *Flemming v. Nestor,* 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960) that not every defeasance of "accrued" interests under the Social Security Act is violative of the Constitution.

ment is received by the IV–D cashiers. The Court hereby *ENJOINS* Defendant from using the date of receipt by the IV–D cashiers of mailed child support payments as the operative date for determining when a $50 pass-through should be paid as a result of that payment.

The Court hereby *FURTHER ENJOINS* Defendant to classify a child support payment sent by mail as "made" on the date it is postmarked.

Finally, it is *ORDERED* that Defendant's Motion for Judgment on a Stipulated Record be, and it is hereby, *GRANTED* as to the second cause of action.

So *ORDERED*.